USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7/5/17_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

CATAÑO ARAGON, BIOJO TORRES
ROBINSON GABRIEL, JORGE CAVEZA
VALENCIA, JHON CARLOS HURTADO
RENDON, RAFAEL URIBE, CARLOS
ALBERTO SALINAS DIAZ, LUIS
FERNANDO URIBE FRANCO, and
DANIEL GERMAN ALARCON SANCHEZ,

Defendants.

**MEMORANDUM
OPINION & ORDER**

15 Cr. 292 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendants Cataño Aragon, Biojo Torres Robinson Gabriel, Jorge Caveza

Valencia, Jhon Carlos Hurtado Rendon, Rafael Uribe, Carlos Alberto Salinas Diaz, Luis

Fernando Uribe Franco, and Daniel German Alarcon Sanchez are charged with (1) conspiracy to

manufacture and distribute, and possess with intent to manufacture and distribute, five kilograms

and more of cocaine while aboard a vessel subject to United States jurisdiction, in violation of

the Maritime Drug Law Enforcement Act (the "MDLEA" or the "Act"), 46 U.S.C. §§ 70503,

70504(b)(1), 70506(b), 18 U.S.C. § 3238, and 21 U.S.C. § 960(b)(1)(A); and (2) manufacturing

and distributing, and possessing with intent to manufacture and distribute, five kilograms and

more of cocaine while aboard a vessel subject to United States jurisdiction, in violation of 46

U.S.C. §§ 70503(a)(1), 70504(b)(1), 70506(a), 18 U.S.C. § 3238 & 2, and 21 U.S.C. §

960(b)(1)(A).[1] (See S6 Indictment (Dkt. No. 82)) The charges against the Defendants arise from

---

[1] Defendant Aragon is now deceased, and the Court has entered a nolle prosequi dismissing all
charges against him. (Dkt. No. 207)

an April 14, 2015 encounter between a U.S. Navy frigate and the Defendants' vessel – the El

Vacan – 135 nautical miles off the coast of Costa Rica. (Cmplt. (Dkt. No. 1) ¶ 6(b); Wolf Decl.,

Ex. G (Checklist) (Dkt. No. 96-7))

                Defendants Uribe, Aragon, Sanchez, Salinas Dias, and Gabriel have moved to

dismiss the Superseding Indictment on a variety of theories.[2] (See Notice of Motion (Dkt. Nos.

70, 88, 165, 183; Dec. 9, 2016 Gabriel Ltr. (Dkt. No. 182)) Defendants contend that

    (1) this prosecution under the MDLEA violates the Due Process Clause of the Fifth
        Amendment, because the Government has not established a sufficient nexus between
        Defendants' conduct and the United States;

    (2) the Government violated the MDLEA by not providing the Ecuadorian authorities
        with sufficient information to determine whether Defendants' vessel was registered in
        Ecuador;

    (3) prosecution of the Defendants not aboard the El Vacan violates the Due Process
        Clause, because these defendants have no connection with the United States;

    (4) the 1996 amendment to the MDLEA violates Defendants' Fifth and Sixth Amendment
        rights, because jurisdiction must be determined by a jury rather than by a court;

    (5) the S6 Indictment is not sufficiently specific;

    (6) the Government has no proof that controlled substances were being transported on the
        El Vacan;

    (7) the Government violated Defendants' Due Process rights when it scuttled the El
        Vacan; and

    (8) the presentment of the Defendants aboard the vessel was unreasonably delayed under
        Fed. R. Crim. P. 5.

(See Uribe Br. (Dkt. No. 72) at 2; Aragon Br. (Dkt. No. 89) at 7, 22-24, 27-28, 32; Uribe Reply

Br. (Dkt. No. 121))[3]

---

[2] Although Aragon is now deceased, this Court has nonetheless addressed his legal arguments, because co-defendants Sanchez and Salinas Diaz joined in Aragon's motion. (See Oct. 28, 2016 Sanchez Ltr. (Dkt. No. 158); Salinaz Diaz Br. (Dkt. No. 185) at n. 2)

[3] Citations reflect the page numbers assigned by this Court's Electronic Case Filing system.

## BACKGROUND

In April 2015, as the result of a Department of Homeland Security investigation of a Colombian drug cartel's transfer of funds to New York City, an undercover agent received information that a shipment of cocaine would be transported from Colombia to Australia on April 14, 2015. (Cmplt. (Dkt. No. 1) ¶ 6(a)) Homeland Security provided this information to the Coast Guard. (Id.)

On April 14, 2015, at about 8:10 a.m., a helicopter assigned to a U.S. Navy frigate was patrolling an area about 135 nautical miles off the coast of Isla de Coco, Costa Rica, when Navy personnel observed the El Vacan – a "go-fast" fiberglass boat – in transit. (Id. ¶ 6(b); Wolf Decl., Ex. G (Checklist) (Dkt. No. 96-7) at 1) Packages were initially observed on the deck of the vessel, but as the helicopter approached the vessel it stopped, and its occupants began throwing the packages overboard. (Cmplt. (Dkt. No. 1) ¶ 6(b)) After the packages were thrown overboard, the vessel began moving again. (Id. ¶ 6(c)) Personnel in the Navy helicopter directed the vessel to stop, but it sped away. (Id.) The pilot then fired warning shots, and the vessel stopped. (Id.)

Videos shot from the helicopter were introduced by the parties in connection with the motions to dismiss. (Swergold Decl., Ex. D (Video of El Vacan) (Dkt. No. 105-5)) The video – and photographic images captured from the video (Wolf Decl., Ex. D (Photographs of El Vacan) (Dkt. No. 96-4) – shows a small green and blue, double-engine "go-fast" vessel in the open sea carrying four men. The port and starboard sides show the name of the vessel – the "El Vacan" – and three stars, along with a decorative X-shape towards the rear. (Id.) A small flag –

3

either a decal or an image painted on the hull – is visible at the rear of the vessel, near the engines. No registry number is visible.[4] (Id.)

Navy personnel recovered twenty-six bales of what appeared to be cocaine from the water. (Id. ¶ 6(d), (g)) The bales weighed approximately 550 kilograms, and a sample from one of the bales tested positive for cocaine. (Id. ¶ 6(g)) After pulling up alongside the El Vacan, Navy personnel boarded the vessel and recovered a GPS device and a cell phone. (Id. ¶ 6(e), (f)) These devices both showed trace amounts of cocaine when scanned with a narcotics trace detector. (Id.) No registration documents were provided concerning the vessel, and Navy personnel found no such documents onboard. (Notice of Motion, Ex. F (State Dept. Certification) (Dkt. No. 70-6))

Defendants Aragon, Gabriel, Valencia, and Rendon were onboard the vessel, and each claimed to be Colombian citizens. (Cmplt. (Dkt. No. 1) ¶ 6(h)) Defendant Rendon told members of the boarding team that the El Vacan was of Ecuadorian nationality and had a home port of "Puerto Manta."[5] (Id.) The boarding team "observe[d][, however,] that there were no registry numbers on the hull of the [v]essel, and that there was a Colombian flag painted on the stern[,] . . . which [Rendon] claimed to be an Ecuadorian flag." (Id.)

---

[4] Defendants maintain that a video shows what "looks like . . . additional writing on El Vacan's hull which would be consistent with the placement of registry information." (July 5, 2016 Tr. (Dkt. No. 135) at 10; see July 22, 2016 Tr. (Dkt. No. 137) at 31) The Court has repeatedly viewed the video (see Swergold Decl., Ex. D (Video of El Vacan) (Dkt. No. 105-5)) and photographic images captured from the video (Wolf Decl., Ex. D (Photographs of El Vacan) (Dkt. No. 96-4), and no registry number is visible. Moreover, as discussed below, the Checklist completed by the boarding team contemporaneously with the interdiction indicates that the hull contained no registry number, and no Defendant has submitted a declaration or affidavit squarely stating that the El Vacan's hull contained a registry number.

[5] Puerto de Manta is an Ecuadorian port. See Puerto de Manta, WORLD PORT SOURCE, http://www.worldportsource.com/ports/ECU_Port_of_Manta_72.php.

4

A Law Enforcement Case Package Checklist (the "Checklist") was apparently prepared by the boarding team contemporaneously with the interdiction of the vessel. (See Wolf Decl. (Dkt. No. 96) ¶ 22) In the Checklist, the boarding team documents its approach to the El Vacan. (Wolf Decl., Ex. G (Checklist) (Dkt. No. 96-7)) The Checklist states that the name on the hull of the vessel is the El Vacan, and that the "Hailing Port on Hull" is "Puerto Esmeralda, Ecu[ador]." (Id. at 2) The Checklist further states that the "Flag State" of the vessel is Ecuador; that a flag state claim was made both verbally and by display of a flag; that no registry numbers are visible on the hull; and that no flag was being flown on the vessel. (Id. at 2-3) The Checklist notes, however, that an Ecuadorian flag is painted on the starboard and portside aft portion of the vessel.[6] (Id. at 3)

Pursuant to a treaty between the United States and Ecuador, the Coast Guard contacted Ecuadorian authorities at 11:55 a.m. and requested confirmation or denial as to the nationality of the El Vacan. (Cmplt. (Dkt. No. 1) ¶ 6(i); Notice of Motion, Ex. E (Dkt. No. 70-5); Wolf Decl., Ex. H (Timeline) (Dkt. No. 96-8)) At 12:20 p.m., the Ecuadorian Coast Guard acknowledged receipt of the request and stated that it would respond in thirty minutes with "Form 3." (Notice of Motion, Ex. C (Dkt. No. 70-3); Wolf Decl., Ex. H (Timeline) (Dkt. No. 96-8)[7] The Ecuadorian Coast Guard stated that it needed additional information, however, including

---

[6] The flags of Colombia and Ecuador are nearly identical. Both feature a double-width yellow band at the top, a quarter-width blue band in the middle, and a quarter-width red band at the bottom. The only distinction between the two flags is a coat of arms displayed in the center of the Ecuadorian flag. (See Flag of Ecuador (Dkt. No. 96-13) Ex. M (citing http://www.flagid.org/found.asp?qa=0000010&su=18&zastava=765&strZ=1); Flag of Colombia at http://flagid.org/found.asp?qa=0010000&ci=R,Y,B&cx=3&co=&zastava=69&strZ=2)
[7] Form 3 is a "Response to Action Request." The form asks the recipient country's officials to either confirm or deny whether a vessel suspected of narcotics trafficking is registered to that country or is of that country's nationality. (Notice of Motion, Ex. D (Dkt. No. 70-4))

5

"photos of the panga, and the names and ids of the crew of the panga."[8] (Notice of Motion, Ex. C (Dkt. No. 70-3) At 12:50 p.m., the Ecuadorian Coast Guard responded on the Form 3 by marking with an "X," the box stating that nationality of the vessel "Can neither be Confirmed nor Denied." (Notice of Motion, Ex. D (Dkt. No. 70-4); Wolf Decl., Ex. H (Timeline) (Dkt. No. 96-8)) The Ecuadorian officials again requested photographs of the vessel, noting that "there are boats registered with the same name." (Id.)

U.S. Coast Guard officials concluded that the El Vacan "was without nationality in accordance with 46 U.S.C. § 70502(d)(1)(C), rendering the vessel subject to the jurisdiction of the United States pursuant to 46 U.S.C. § 70502(c)(1)(A)." (Notice of Motion, Ex. F (State Dept. Certification) (Dkt. No. 70-6)) The occupants of the El Vacan were placed under arrest at 3:00 p.m. (Wolf Decl., Ex. G (Checklist) (Dkt. No. 96-7) at 7-8) The U.S. Navy then scuttled the El Vacan, because it constituted a navigational hazard. (Id. at 9)

## DISCUSSION

## I.    THE MARITIME DRUG LAW ENFORCEMENT ACT ("MDLEA")

Article I, Section 8 of the Constitution – the "Define and Punish Clause" – grants Congress authority to, "define and punish piracies and felonies committed on the high seas, and offenses against the law of nations. . . ." The Supreme Court has read this clause to grant Congress the authority to define and punish piracy, felonies on the high seas, and offenses against the law of nations. See United States v. Smith, 18 U.S. 153, 158-59 (1820). In enacting the MDLEA, Congress invoked "its constitutional power '[t]o define and punish Piracies and

---

[8] A panga is a type of modest-sized, open, outboard-powered, fishing boat. Collins English Dictionary, https://www.collinsdictionary.com/us/dictionary/english/panga (last visited July 5, 2017); see Swergold Decl., Ex. D (Video of El Vacan) (Dkt. No. 105-5).

6

Felonies committed on the high Seas." United States v. Matos-Luchi, 627 F.3d 1, 3 (1st Cir. 2010) (quoting U.S. Const. art. I § 8, cl. 10).

The MDLEA makes it unlawful to "knowingly or intentionally" "manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance" on board "a vessel of the United States or a vessel subject to the jurisdiction of the United States," or to conspire to do the same. 46 U.S.C. §§ 70503(a), 70506(b). The Act defines a "vessel subject to the jurisdiction of the United States" to include a "vessel without nationality." 46 U.S.C. § 70502(c)(1)(A). A "vessel without nationality" under the MDLEA includes

(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;

(B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and

(C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1)(A)-(C).

"A claim of nationality or registry under [the MDLEA] includes only"

(1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;

(2) flying its nation's ensign or flag; or

(3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

46 U.S.C. § 70502(e)(1)-(3). The Act further states that "[t]he response of a foreign nation to a claim of registry . . . is proved conclusively by certification of the Secretary of State or the Secretary's designee." 46 U.S.C. § 70502(d)(2).

7

## II.   DEFENDANTS' DUE PROCESS AND MDLEA-RELATED CLAIMS

### A.   Due Process Claims of Defendants Onboard the *El Vacan*

Defendants argue that – in charging them with violations of the MDLEA – the Government has violated the Fifth Amendment's Due Process Clause, because there is no nexus between Defendants' alleged unlawful conduct and the United States. (See Uribe Br. (Dkt. No. 72) at 5; Aragon Br. (Dkt. No. 89) at 7; Sanchez Br. (Dkt. No. 168) at 25)

### 1.   Whether a Nexus with the United States Need Be Shown

As a general matter, "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair."" United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003) (quoting United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)).

Defendants argue that the Constitution's Define and Punish Clause does not permit the assertion of jurisdiction in this case. (See Sanchez Br. (Dkt. No. 168) at 8; U.S. Const. art. I, § 8, cl. 10) In arguing that application of the MDLEA is constitutional under the circumstances of this case, the Government relies on Congress's power under the Constitution to "define and punish . . . felonies committed on the high seas."

Given that the Felonies Clause "does not explicitly require [that] a nexus between the unlawful conduct committed on the high seas and the United States be established before Congress can punish that conduct," United States v. Nueci-Pena, 711 F.3d 191, 198 (1st Cir. 2013), most circuits that have considered whether the MDLEA requires a nexus to the United States have found that it does not. See United States v. Campbell, 743 F.3d 802, 812 (11th Cir. 2014); Nueci-Pena, 711 F.3d at 198; United States

8

v. Suerte, 291 F.3d 366, 375 (5th Cir. 2002); United States v. Martinez-Hidalgo, 993 F.2d 1052, 1056 (3d Cir. 1993). This Court finds these cases persuasive.

## 2. Whether the *El Vacan* Was a "Stateless Vessel"

Even if this Court were to conclude that a nexus with the United States is ordinarily required to exercise jurisdiction under the MDLEA, here the Government contends that the El Vacan was a "stateless" vessel on the high seas.[9] Under such circumstances, due process is not violated even where no nexus with the United States is shown. "'[S]tateless vessels on the high seas are, by virtue of their statelessness, subject to the jurisdiction of the United States . . . even absent proof that the vessel's operators intended to distribute the cargo in the United States.'" United States v. Henriquez, 731 F.2d 131, 135 (2d Cir. 1984) (quoting United States v. Pinto-Mejia, 720 F.2d 248, 260-61 (2d Cir. 1983)); see also United States v. Perlaza, 439 F.3d 1149, 1161 (9th Cir. 2006) ("[i]f a vessel is deemed stateless, there is no requirement that the government demonstrate a nexus between those on board and the United States before exercising jurisdiction over them"); United States v. Rendon, 354 F.3d 1320, 1325 (11th Cir. 2003) ("Because stateless vessels do not fall within the veil of another sovereign's territorial protection, all nations can treat them as their own territory and subject them to their laws."); United States v. Dow, et al, No. 16 Cr. 453 (RJS) (S.D.N.Y. June 1, 2017) (Dkt. No. 97

---

[9] Salinas Diaz argues that – although the El Vacan was 135 nautical miles off the coast of Costa Rica – it was not on the high seas, but rather in foreign waters where the MDLEA has no application. (See Salinas Diaz Br. (Dkt. No. 185) at 6) The "high seas" is generally understood to mean the area outside of a nation's territorial waters, however, which extend twelve nautical miles from shore. See United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. ("UNCLOS") Art. 3 ("Every State has the right to establish the breadth of its territorial sea up to a limit not exceeding 12 nautical miles"); In re Air Crash Off Long Island, New York, on July 17, 1996, 209 F.3d 200, 205-06 (2d Cir. 2000) (surveying international and domestic law and concluding that the "high seas" are those outside of any nation's territorial waters). Accordingly, the El Vacan was on the high seas.

9

at 12) ("Defendants sailed a vessel 'without nationality' and are alleged to have engaged in 'self-evidently criminal' behavior – namely, transporting mass quantities of cocaine over the high seas. [] Accordingly, it is clear that Defendants' prosecution is not inconsistent with the Due Process Clause.") (quoting United States v. Al Kassar, 660 F.3d 108, 119 (2d Cir. 2011)); United States v. Cuero, et al, No. 15 Cr. 125 (PKC) (S.D.N.Y. May 16, 2017) (Dkt. No. 45) at 7 ("The Court need not engage in a nexus analysis under Yousef because defendants' vessel was stateless."); United States v. Prado, 143 F. Supp. 3d 94, 98 (S.D.N.Y. 2015) (noting that "[t]he reasoning behind the jurisdictional holdings of Henriquez and Pinto-Mejia also informs, and in a sense modifies, Yousef's due process nexus requirement in the case of stateless vessels"); United States v. Greer, 956 F. Supp. 531, 535 (D. Vt. 1997) ("jurisdiction may be asserted over a stateless vessel regardless of whether there is a nexus with the United States").

Defendants argue, however, that the El Vacan was not a stateless vessel, because (1) Rendon told Navy personnel that the vessel was of Ecuadorian nationality; (2) the Ecuadorian port of Puerto Esmeralda was inscribed on the hull; and (3) the flag of Ecuador was painted on the hull of the boat. (Uribe Br. (Dkt. No. 72) at 7; Aragon Br. (Dkt. No. 89) at 9-10, 19-21, 23 n.4, 27-28; DeBlasio Decl. (Dkt. No. 77) ¶¶ 7-8, 15)

In Prado, however, the court rejected the defendant's argument that a small flag painted on the hull of a go-fast boat was sufficient to establish a claim of nationality under the MDLEA. See Prado, 143 F. Supp. 3d at 100. The court found that "[t]he small emblem at the rear of defendants' boat, even assuming it is an image of an Ecuadorian flag, is not remotely large or prominent enough to put a reasonable official on notice that Ecuador's interests might be affected by the interdiction of defendants' boat." Id. Moreover, given that the vessel in Prado contained no registration documents, and "the go-fast had minimal, if any, identifying features,"

the "defendants' boat was unregistered and therefore stateless as a matter of international and constitutional law."[10] Id. at 99. This analysis applies with equal force here.

Even accepting Defendants' contentions that a claim of Ecuadorian nationality was made, and that the Ecuadorian flag was painted on the El Vacan's hull, however, the El Vacan still constitutes a "stateless" vessel for purposes of the MDLEA, because – when contacted by the U.S. Coast Guard about the nationality of the El Vacan – Ecuador did not confirm that the vessel was registered to Ecuador or was of Ecuadorian nationality. See 46 U.S.C. § 70502(d)(1)(C) (a vessel without nationality includes "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality"); see also United States v. Cruz, 503 F. App'x 837, 838 (11th Cir. 2013) (upholding jurisdiction under the MDLEA where "[n]either Colombia nor Ecuador could confirm or deny the nationality of the vessel"); United States v. Salazar-Realpe, No. 15-087 (PAD), 2015 WL 3820757, at *3 (D.P.R. June 18, 2015) (denying motion to dismiss indictment where "the Coast Guard contacted the government of Ecuador and the latter failed to confirm or deny the vessel's claim of Ecuadorian registry. . . .").

This Court concludes that the El Vacan was a stateless vessel. By virtue of that status, it was subject to the jurisdiction of the United States, even absent any nexus to the United States. See Henriquez, 731 F.2d at 135 ("stateless vessels on the high seas are, by virtue of their statelessness, subject to the jurisdiction of the United States . . . even absent proof that the vessel's operators intended to distribute the cargo in the United States."). Accordingly, it is

---

[10] The Prado court noted that "international law, while not a perfect guide, is the best guide to determine statelessness as a constitutional matter. Statelessness under international law follows from a vessel's lack of registration with any country." Id. at 98 (internal citation omitted).

11

proper to assert jurisdiction over those Defendants who were onboard the El Vacan, and

Defendants' Due Process challenge is rejected.[11]

---

[11] Defendants contend that they are entitled to an evidentiary hearing on the "stateless" vessel issue, citing United States v. Mitchell-Hunter, 663 F.3d 45 (1st Cir. 2011). (See Aragon Br. (Dkt. No. 89) at 16). In Mitchell-Hunter, however, the First Circuit found that the district court properly denied the request for an evidentiary hearing: "[E]ither the vessel was stateless because Columbia could not confirm nor refute its registry, or it was stateless because Venezuela had issued the same equivocal response. [The defendant] made no argument that the vessel was registered with a third country or was otherwise outside the jurisdiction of the United States under the MDLEA. The district court therefore had sufficient evidence to [find] statelessness, and that no material facts regarding the jurisdictional determination were in dispute." Mitchell-Hunter, 663 F.3d at 53. The same reasoning applies here, because no material facts concerning jurisdiction are in dispute.

For purposes of resolving Defendants' motion, this Court finds that Defendant Rendon made a claim of Ecuadorian registry; that an Ecuadorian flag was painted on the El Vacan's hull; and that an Ecuadorian port was listed on the hull. This Court further finds – based on the video and photographic evidence, the Checklist completed by the boarding team at the time of the interdiction, the Coast Guard's Action Request to Ecuador, and the Coast Guard's Situational Report concerning the interdiction of the El Vacan – that there was no registry number on the vessel's hull. (See Swergold Decl., Ex. D (Video of El Vacan) (Dkt. No. 105-5); Wolf Decl., Ex. D (Photographs of El Vacan) (Dkt. No. 96-4); Wolf Decl., Ex. G (Checklist) (Dkt. No. 96-7) at 2; Notice of Motion, Ex. E (Action Request) (Dkt. No. 70-5) at 2, 6) (stating that the hull contained no registration number); Swergold Decl., Ex. E (Coast Guard Situational Report) (Dkt. No. 105-6) at 2 ("No registry numbers were on the hull."))

Defendants have not offered evidence sufficient to create a material issue of fact as to whether a registry number was present on the hull. Aragon – the only defendant to have submitted a declaration concerning the jurisdictional issue – does not squarely assert that a registry number was present on the El Vacan's hull. (See Wolf Decl., Ex. A (Aragon Decl.) (Dkt. No. 96-1)) Instead, he mentions in passing that he "saw one of the [U.S. military] agents lean out over the side of the boat to take pictures; he was photographing the flag and registry information painted on the side of the boat." (Id. ¶ 18) As noted earlier, however, the video and the photographic still shots extracted from the video footage do not show a registry number on the side of the hull, and the boarding team's Checklist, the "Action Request" to Ecuador, and the Coast Guard Situational Report all indicate that no registry numbers were present on the hull. (See Swergold Decl., Ex. D (Video of El Vacan) (Dkt. No. 105-5); Wolf Decl., Ex. D (Photographs of El Vacan) (Dkt. No. 96-4); Wolf Decl., Ex. G (Checklist) (Dkt. No. 96-7) at 2; Notice of Motion, Ex. E (Action Request) (Dkt. No. 70-5) at 2, 6); Swergold Decl., Ex. E (Coast Guard Situational Report) (Dkt. No. 105-6) at 2)) Under these circumstances, Aragon's account of what he thinks the agent was photographing – and his passing reference to a registry number – is not sufficient to create a material issue of fact.

### 3. Whether the Government Should be Barred from Claiming that the *El Vacan* was a "Stateless" Vessel

Defendants contend that the Government should be barred from contending that the El Vacan was a "stateless vessel" under the MDLEA, because the Coast Guard did not provide the Ecuadorian authorities with photographs of the vessel, as they had requested. (See Uribe Br. (Dkt. No. 72) at 2-3, 7; Aragon Br. (Dkt. No. 89) at 13, 22-24, 27-28) According to Defendants, by failing to provide photographs of the El Vacan, "[t]he U.S. Coast Guard . . . thwarted the Ecuadorian government's efforts to 'affirmatively or unequivocally assert' or deny nationality, as required under the statute." (Uribe Br. (Dkt. No. 72) at 14; see also Aragon Br. (Dkt. No. 89) at 24 ("By failing to respond to Ecuador's requests, the [U.S. Coast Guard] denied Ecuador the right to make that affirmative assertion or to deny it, as the case may have been."))

The MDLEA does not specify or address what information must be provided to the "claimed nation of registry" in order to permit that nation to "affirmatively and unequivocally assert that the vessel is of its nationality," however. See 46 U.S.C. § 70502(d)(1)(C). Here, the Coast Guard provided the Ecuadorian Coast Guard with the following information:

the name of the vessel (the El Vacan);

the master's verbal claim of Ecuadorian registry;

that the home port of Puerto Manta was inscribed on the stern;

the length of the vessel (9.6 meters, or about 31 and a half feet);

that no registry number was inscribed on the hull;

the nature of the vessel ("panga") and that it contained two engines;

the nautical location of the vessel (04-57N 084-54W);

that the hull was made of fiberglass and was green in color;

13

the name of the master, his nationality, the number of his Colombian passport, and number of crew members (4);

the claimed purpose of the voyage, which was the "search and rescue of a friend at sea";

that the vessel carried no cargo, other than the bales that had been jettisoned;

the date the vessel departed, the port it departed from (Puerto Esmereldes, Ecuador), and the expected date of arrival and the port of arrival (Puerto Esmereldes, Ecuador);

that the master had little knowledge of fishing grounds and fishing operations;

that the vessel was located more than 200 nautical miles from the alleged flag state and outside normal fishing grounds;

that the vessel was not engaged in fishing;

that the vessel was located on a course/route consistent with drug smuggling operations;

that the vessel made erratic course and speed changes once it was approached by the Navy helicopter; and

that bales had been observed on deck and were jettisoned from the vessel when the Navy helicopter approached.

(Notice of Motion, Ex. E (Action Request) (Dkt. No. 70-5))

Accepting that the Coast Guard had not provided Ecuadorian authorities with the requested photographs of the vessel before Ecuador stated that it could neither confirm nor deny the nationality of the vessel, this Court concludes that there is no basis – under the circumstances of this case – to preclude the Government from arguing that the El Vacan was a "stateless" vessel.[12]

---

[12] The Second Circuit has noted that "the MDLEA requires the consent of foreign nations for purposes of international comity and diplomatic courtesy, not as a protection for defendants." United States v. Greer, 285 F.3d 158, 175 (2d Cir. 2002). Accordingly, Defendants do not have standing to raise the issue of whether the United States complied with its obligations under its treaty with Ecuador. That issue can be raised by Ecuador alone. See United States v. Cardales-Luna, 632 F.3d 731, 737 (1st Cir. 2011).

14

## B. Whether the Navy Violated the MDLEA by Boarding the *El Vacan*

Defendants contend that the Navy violated the MDLEA by "board[ing] [the] El

Vacan before ascertaining [its nationality], or after choosing to ignore, [the] El Vacan's indicators

of nationality." (Aragon Br. (Dkt. No. 89) at 21)

As explained in United States v. Romero-Galue, 757 F.2d 1147 (11th Cir. 1985),

the right to board a vessel is governed by international law:

> The "right of approach" is a doctrine of international maritime common law that bestows a nation's warship with the authority to hail and board an unidentified vessel to ascertain its nationality. [United States v. Williams, 617 F.2d 1063, 1082 (5th Cir. 1980)] (quoting United States v. Cortes, 588 F.2d 106, 110-11 (5th Cir. 1979)). If suspicions as to the vessel's nationality persist, as they well may even after the captain has declared her nation of registry, the inquiring nation may board the vessel and search for registration papers or other identification in order to verify the vessel's nationality. Williams, 617 F.2d at 1082; United States v. Postal, 589 F.2d 862, 870-71 (5th Cir.), cert. denied, 444 U.S. 832[] (1979). The "right of approach" is codified by article 22 of the Convention on the High Seas. . . .

Romero-Galue, 757 F.2d at 1149 n.3. Given that the nationality of the El Vacan was not clear at

the time the vessel was boarded, Navy personnel committed no violation of either international

law or of the MDLEA in boarding the vessel. Moreover, even if Navy personnel erred in

boarding the El Vacan, that error would raise an issue of international law, which Defendants

have no standing to assert. As noted above, the MDLEA "requires the consent of a vessel's flag

nation . . . to protect the interest of that flag nation and international comity, not the interest of

the individuals aboard the vessel." United States v. Devila, 216 F.3d 1009, 1017 (11th Cir.

2000), vacated in part on other grounds by United States v. Devila, 242 F.3d 995 (11th Cir.

2001). The Navy's boarding of the El Vacan provides no basis for dismissing the indictment.

## C. Due Process Claims of Defendants Not Onboard the *El Vacan*

### 1. Defendant Rafael Uribe

Defendant Rafael Uribe argues that "[a]ssuming arguendo that the Court finds that [the El Vacan] was stateless, . . . this Court must nevertheless dismiss the Superseding Indictment against [him] for lack of proof of nexus [with the United States]," because Uribe "was not on board the El Vacan." (Uribe Br. (Dkt. No. 72) at 10) The Government contends, however, that in furtherance of the charged conspiracy, and at the request of alleged co-conspirator and co-defendant Luis Fernando Uribe Franco, Uribe met with a confidential informant at a Manhattan diner on April 11, 2015 – three days before the interdiction of the El Vacan. At that meeting, Uribe gave the informant $3,000 – allegedly at co-defendant Franco's request – to secure Australian travel documents for co-defendant Salinas Diaz and other co-conspirators. The informant gave Uribe a set of keys to an apartment or mailbox in Australia to pass on to Franco. (See DeBlasio Decl. (Dkt. No. 77) ¶¶ 29-58; see Govt. Br. (Dkt. No. 104) at 14)

Because the Government alleges that Uribe engaged in acts in furtherance of the charged conspiracy within the United States, there is no nexus issue as to Uribe.[13]

---

[13] Uribe contends that – as a result of a February 2016 amendment to the MDLEA – the Act "only provides for the prosecution of individuals on board vessels who possess, distribute[,] or manufacture controlled substances; it does not also provide for the prosecution of individuals who conspire to violate" that provision. (Uribe Reply Br. (Dkt. No. 121) at 3) (emphasis in original)

The February 2016 amendments to the MDLEA are irrelevant to this prosecution, however, because the charged conduct occurred in April 2015. (Cmplt. (Dkt. No. 1) ¶ 1) Absent a clear directive from Congress that an amendment to a statute is to be applied retroactively, the version of a statute in place when charged conduct occurred controls. See Landgraf v. USI Film Prod., 511 U.S. 244, 245 (1994). In any event, both the pre-amendment and post-amendment versions of the MDLEA make it a crime to conspire to violate 46 U.S.C. § 70503. See 46 U.S.C. § 70506(b) ("[a] person attempting or conspiring to violate section 70503 of this title is subject to the same penalties as provided for violating section 70503").

16

## 2. Defendant Sanchez

Sanchez argues that he is not a citizen or resident of the United States, and that he "was never [onboard the El Vacan] on the high seas, never in the United States, never in any territory controlled by the United States, and never took part in any activities that jeopardized United States' security or interests." (Sanchez Reply Br. (Dkt. No. 193) at 11) Sanchez further contends that – even if the MDLEA confers jurisdiction in this case – his prosecution violates the Due Process Clause of the Fifth Amendment, because "given the absence of any connection to the United States," "[i]t was not reasonably foreseeable that [he] might be punished by the United States government for engaging in actions in Colombia that had no intended or indirect effect on the United States." (Sanchez Br. (Dkt. No. 168) at 26) Sanchez also argues that although 46 U.S.C. § 70506(b) makes it a crime to conspire to violate 46 U.S.C. § 70503, Section 70506(b) "only defines an additional theory of liability on which the penalties listed may be imposed. It does not confer jurisdiction beyond that conferred in [S]ection 70503." (Id. at 21-22)

The Government argues that, "[b]y conspiring to traffic cocaine onboard a stateless vessel, the defendants sacrificed the protection of any single nation and opened themselves up to prosecution by any nation that captured them." (Govt. Br. (Dkt. No. 189) at 13)

The Government claims that, between February and April 2015, Sanchez, Salinas Diaz, and Franco (collectively, the "Colombia Defendants") were working with a Colombian drug trafficking organization to transport approximately 1,000 kilograms of cocaine from Colombia to Australia. (See id. at 7) The Colombia Defendants met with and spoke by telephone with a confidential source to arrange for a shipping vessel to transport the cocaine to Australia. (See id.) The Government further alleges that the Colombia Defendants sent a co-

17

conspirator – Uribe, a United States citizen – to New York to engage in meetings in furtherance of the conspiracy. (See id. at 15) During discussions with the confidential source, the Colombia Defendants acknowledged that the drug trafficking organization had selected Australia as the destination for the cocaine because of concerns about detection by United States authorities. (See id. (citing United States v. Ballestas, 795 F.3d 138, 148 (D.C. Cir. 2015) (holding that defendant and co-conspirators' planning of routes for "cocaine-laden vessels so as to avoid detection by maritime and law enforcement authorities," including specifically United States authorities, "establish[ed] that application of a United States drug trafficking law (the MDLEA) to [the defendant] was neither arbitrary nor fundamentally unfair"))

In Ballestas, a Colombian defendant was charged with MDLEA conspiracy. Ballestas had never boarded the stateless vessel at issue, and he had not committed any acts in furtherance of the MDLEA conspiracy on United States soil. Ballestas, 795 F.3d at 142-43. Ballestas contended that the MDLEA's conspiracy provision did not apply extraterritorially to reach his conduct in Colombia, and that exercising jurisdiction over him violated the Due Process Clause, because there was no nexus between his alleged criminal conduct and the United States. Id. The D.C. Circuit rejected Ballestas's arguments:

> [I]n the particular context of "an ancillary offense like aiding and abetting or conspiracy," we have held that, "[g]enerally, the extraterritorial reach of [the] ancillary offense . . . is coterminous with that of the underlying criminal statute." United States v. Ali, 718 F.3d 929, 939 (D.C. Cir. 2013). As a result, "when the underlying criminal statute's extraterritorial reach is unquestionable, the presumption [against extraterritoriality] is rebutted with equal force" for ancillary offenses in the same statute. Id.; see United States v. Hill, 279 F.3d 731, 739 (9th Cir. 2002). Here, because the substantive offense established in § 70503(a) applies extraterritorially, we conclude that conspiracy to commit that substantive offense under § 70506 also has extraterritorial reach.

Id. at 144. This Court finds the reasoning of Ballestas persuasive.

While Sanchez may not have anticipated that he would be prosecuted in the United States (see Sanchez Br. (Dkt. No. 168) at 26), the Second Circuit has held that "[f]air

18

warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." Al Kassar, 660 F.3d at 119 (emphasis in original).

Moreover, Sanchez's construction of the MDLEA's conspiracy provision "would effectively inoculate many members of [drug trafficking] organizations . . . against prosecution. Drug kingpins and other conspirators who facilitate and assist in carrying out trafficking schemes would fall beyond the reach of the statute, compromising the overriding intent of Congress in enacting [the MDLEA]." Ballestas, 795 F.3d at 145.

Sanchez's motion to dismiss the indictment based on an alleged violation of the Due Process Clause – premised on a lack of nexus with the United States – will be denied.

## D. Uribe's Claim that the MDLEA Violates the Fifth and Sixth Amendments

In 1996, Section 70504(a) of the MDLEA was amended to provide that the "[j]urisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a).

Uribe argues that these amendments to the MDLEA violate defendants' Fifth and Sixth Amendment "right to due process and trial by jury" by "remov[ing] from jury consideration the jurisdictional requirement, and stat[ing] instead that jurisdiction with respect to a vessel is not an element of [the] offense." (Uribe Br. (Dkt. No. 72) at 15 (internal quotation marks and citation omitted); see also Uribe Reply Br. (Dkt. No. 121) at 6, 15)

Although the Second Circuit has not addressed whether jurisdiction under Section 70504 of the MDLEA must be determined by a jury, the First and Eleventh Circuits have upheld

19

the constitutionality of Section 70504. See United States v. Vilches-Navarrete, 523 F.3d 1, 20, 23 (1st Cir. 2008) ("Congress acted well within constitutional boundaries in determining that the question of whether a vessel is 'subject to the jurisdiction of the United States' is not an essential element of § 70503(a)(1)"; "[w]e hold that § 70504(a) is constitutional"); United States v. Tinoco, 304 F.3d 1088, 1111-12 (11th Cir. 2002) ("Although the Due Process Clause and the Sixth Amendment right to a jury trial require that each element of a criminal offense be submitted to the jury . . . Congress made clear [in] . . . the MDLEA that the jurisdictional requirement . . . is an issue that goes only to the subject matter jurisdiction of the federal courts. We . . . have concluded that Congress had the flexibility under the Constitution . . . to decide that the jurisdictional issue should be solely one of subject matter jurisdiction for the court to decide, and not an element of the MDLEA substantive offense.").

In upholding the constitutionality of Section 70504(a), the First Circuit began its analysis by noting that "Congress enjoys latitude in determining what facts constitute elements of a crime which must be tried before a jury and proved beyond a reasonable doubt and which do not." Vilches-Navarrete, 523 F.3d at 20 (citing Staples v. United States, 511 U.S. 600, 604 (1994) (the "definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute"); McMillan v. Pennsylvania, 477 U.S. 79, 86 (1986) ("[W]e should hesitate to conclude that due process bars the State from pursuing its chosen course in the area of defining crimes and prescribing penalties.").

In concluding that Congress was constitutionally permitted to provide that "the 'subject to jurisdiction' issue is not an element of § 70503(a)(1)[,] . . . [the First Circuit noted that] the presumption of a defendant's innocence is not affected; the underlying determination

20

does not subject the defendant to an increased penalty; and there is no evidence that Congress was attempting to evade defendants' constitutional rights." Vilches-Navarrete, 523 F.3d at 20.

The First Circuit also pointed out that "the determination of whether a vessel is subject to the jurisdiction of the United States. . . . does not meet the common law definition of an element," because "[a]t common law, the elements of an offense included 'each part of the actus reus, causation, and the mens rea' that the government needed to establish in order to obtain a conviction," and the "question of whether a vessel is subject to the jurisdiction of the United States . . . does not relate to whether a defendant committed the proscribed actus reus or possessed the necessary mens rea." Id. at 21 (quoting Tinoco, 304 F.3d at 1108); see also Tinoco, 304 F.3d at 1108 (the "requirement . . . that a vessel be subject to the jurisdiction of the United States . . . does not go to the actus reus, causation, or the mens rea of the defendant" and is therefore "unlike . . . the . . . components that make up the traditional offense elements as historically understood in this country").

Finally, the First Circuit found that "the argument that this 'subject to jurisdiction' question is not an element . . . is strengthened by the fact that Congress did not need to include a provision in the MDLEA that the vessel be subject to the jurisdiction of the United States," because "Congress can punish crimes committed on the high seas regardless of whether a vessel is subject to the jurisdiction of the United States." Vilches-Navarrete, 523 F.3d at 21-22. Indeed, "Congress inserted the requirement that a vessel be subject to the jurisdiction of the United States into the statute as a matter of diplomatic comity." Id. at 22 (citing Tinoco, 304 F.3d at 1108).

The Eleventh Circuit applies much the same reasoning in likewise upholding the constitutionality of the 1996 amendments to the MDLEA. See Tinoco, 304 F.3d at 1107-09. The

21

Eleventh Circuit found that the 1996 amendments do not undermine the presumption of innocence and do not address factual questions that traditionally have been treated as elements of an offense under the common law. See id. at 1107-12.

Judge Sullivan of this District has likewise concluded that the "subject to jurisdiction" question under Section 70504 need not be put to a jury. In United States v. Dow, et al, No. 16 Cr. 453 (RJS) (S.D.N.Y. June 1, 2017) (Dkt. No. 97 at 6), the defendants argued that factual issues regarding whether a vessel was subject to the jurisdiction of the United States must be resolved by a jury. In rejecting that argument, Judge Sullivan agreed that "[t]he Fifth and Sixth Amendments are not implicated where . . . the question to be resolved – the issue of jurisdiction – neither alters 'the presumption of a defendant's innocence' nor 'subject[s] the defendant to an increased penalty,' and [where] there was 'no evidence that Congress was attempting to evade defendants' constitutional rights.'" (Id. at 8 (quoting Vilches-Navarrete, 523 F.3d at 20))

This Court is likewise persuaded by the reasoning of Vilches-Navarrete that Section 70504(a) does not violate a defendant's constitutional right to due process and trial by jury.[14] Accordingly, the S6 Indictment will not be dismissed on the ground that the MDLEA violates the Fifth and Sixth Amendments.

## III.    THE OPERATIVE INDICTMENT IS ADEQUATELY PLED

Sanchez argues that the S6 Indictment is "fatally non-specific on the required element of the alleged agreement among those [Defendants] on land and those [Defendants] on the vessel." (Sanchez Br. (Dkt. No. 168) at 23) Sanchez complains that "[t]he [G]overnment has

---

[14] This Court acknowledges that the Ninth Circuit reached a contrary result in Perlaza, 439 F.3d at 1166-67 (concluding that where a jurisdictional question turns on factual issues, that inquiry must be resolved by a jury). The Perlaza court's reasoning is not persuasive.

yet to provide any specific allegations [as to] how and when Mr. Sanchez conspired to manufacture or distribute controlled substances aboard a vessel subject to the jurisdiction of the United States, as required by 46 U.S.C. § 70503(a)." (Id.) Sanchez further argues that "[t]he [operative] indictment does not contain essential facts that will apprise Mr. Sanchez of what he is to meet at trial." (Id. at 25)

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" United States v. Vilar, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1) (alterations omitted)). "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)). Thus, "to satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Id. (internal citation and quotation marks omitted). "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350 U.S. 359, 363 (1956).

Dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). Moreover, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial[,] the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an

indictment." United States v. Perez, 575 F.3d 164, 166-67 (2d Cir. 2009) (quotation marks and alteration omitted).

Here, the S6 Indictment alleges all of the necessary elements of the offense: Sanchez – along with his co-defendants – (1) intentionally and knowingly conspired with others to violate 46 U.S.C. §§ 70503(a)(1) and 70506(a) by manufacturing and distributing, and possessing with intent to distribute, on board a vessel subject to the jurisdiction of the United States, five kilograms and more of cocaine, and (2) did manufacture and distribute, and possessed with intent to manufacture and distribute, and aided and abetted the same, on board a vessel subject to the jurisdiction of the United States, more than five kilograms of cocaine. (S6 Indictment (Dkt. No. 82) ¶¶ 1-4) The S6 Indictment further alleges that the conspiracy occurred between February 2015 and April 2015. (Id. ¶ 1) This is sufficient to satisfy the pleading standards of Rule 7(c)(1).

## IV.   **ALLEGED ABSENCE OF A CONTROLLED SUBSTANCE**

Defendants argue that "no 'controlled substance' was recovered 'on board' the vessel," and that "[t]he 550 kilos of cocaine charged against the Defendants [were] recovered from the Pacific Ocean, about one nautical mile from the point of interdiction." Given these circumstances, Defendants assert that "[a]ny evidence that [they] 'possessed' a controlled substance is circumstantial at best." (Aragon Br. (Dkt. No. 89) at 24-25 (citing Wolf Decl. (Dkt. No. 96) ¶ 16)) With respect to the GPS system and cell phone recovered from the vessel – both of which contained trace amounts of cocaine (see Cmplt. (Dkt. No. 1) ¶ 6(f)) – Defendants argue that "those devices . . . could have picked up trace amounts of cocaine virtually anywhere and been placed on the boat at any time." (Aragon Br. (Dkt. No. 89) at 25)

On a pretrial motion to dismiss, the district court must accept as true the

allegations in an indictment. See United States v. Mango, 199 F.3d 85, 89 (2d Cir. 1999); United

States v. Carnesi, 461 F. Supp. 2d 97, 98 (E.D.N.Y. 2006); United States v. Martinez, No. S1 94

CR 219 (RPP), 1995 WL 10849, at \*2 (S.D.N.Y. Jan. 12, 1995).

Here, the S6 Indictment adequately alleges that Defendants manufactured and

distributed, and possessed with intent to manufacture and distribute, on board a vessel subject to

the jurisdiction of the United States, five kilograms and more of cocaine, and that they conspired

to do the same. (See S6 Indictment. (Dkt. No. 82) ¶¶ 2-4) Defendants' contention that the

Government's proof will fall short is premature. That issue must instead be determined by a jury

at trial. See Carnesi, 461 F. Supp. 2d at 99.

Defendants' motion to dismiss the S6 Indictment on the ground that no cocaine

was recovered from the El Vacan will be denied.

## V. SPOLIATION OF EVIDENCE

Defendants argue that the S6 Indictment must be dismissed because the

Government violated the Due Process Clause when it scuttled the El Vacan, thereby destroying

material exculpatory evidence. (See Aragon Br. (Dkt. No. 89) at 28-29) Defendants contend

that the exculpatory evidence destroyed by the Navy includes "information inscribed on El

Vacan's hull[,] . . . [such as the vessel's] name, flag, homeport and possibly a registry number,"

all of which are necessary to "determine whether . . . El Vacan was 'a vessel without

nationality.'" (Id. at 29-30)

To prevail on a spoliation claim

> defendants must show (1) that the go-fast [vessel] "possessed exculpatory value
> that was apparent before [it] was destroyed," California v. Trombetta, 467 U.S.
> 479, 489 [] (1984), (2) that the boat was "of such a nature that the defendant
> would be unable to obtain comparable evidence by other reasonably available

25

means," id., and (3) that the government acted in bad faith, United States v. Barnes, 411 F. App'x 365, 368-69 (2d Cir. 2011).

Prado, 143 F. Supp. 3d at 101.

In Prado, Judge Rakoff rejected a spoliation argument likewise premised on the scuttling of a go-fast boat. Without reaching the question of whether the vessel constituted material exculpatory evidence, the court found that the "defendants fail[ed] to satisfy the other two" requirements:

> [A]s to the second element, the Government has produced extensive video and photographic evidence of the go-fast . . . such that defendants have already "obtain[ed] comparable evidence." Trombetta, 467 U.S. at 489 []. As to the third element, the Government claims that it destroyed the go-fast in good faith because the boat was a hazard to navigation. The video footage shows that the craft was in the open ocean and loaded with drums of fuel that constituted an obvious hazard. [Perlaza, 439 F.3d at 1156] (describing destruction of go-fast as "hazard to navigation").

Id. at 101-02 (citations and footnote omitted).

Here, as to the first element, Defendants have not shown that they were deprived of material exculpatory information.[15] While they contend that the scuttling of the El Vacan deprived them of evidence regarding the vessel's "name, flag, homeport and possibly a registry number" (Aragon Br. (Dkt. No. 89) at 29-30), the Government concedes that the hull of the vessel contained the vessel's name, a painted image of the Ecuadorian flag, and the vessel's Ecuadorian home port. As to the registry number – as discussed above – given the video, the photographic evidence, and all the other evidence in the record, there is no reason to believe that the hull of the El Vacan contained a registry number.

---

[15] This Court assumes for purposes of resolving Defendants' motion to dismiss that evidence relevant to the jurisdictional issue could constitute material exculpatory information.

As to the second element of spoliation, as in Prado, the video and photographic

evidence is such that Defendants have available "comparable evidence." See Prado, 143 F.

Supp. 3d at 101.

Finally, as to the third element of spoliation, Defendants have not shown that the

Government acted in bad faith. The Coast Guard Situational Report concerning the interdiction

of the El Vacan states that

> [t]he [boarding team] disembarked the vessel due to poor stability and inclement weather.
> There was no suitable location to make off a towing hawser, and the vessel was deemed
> to be too light and have too low of a freeboard to be towed safely. The vessel was not
> self[-]draining and was collecting water in the bilge. [Command] authorized sinking the
> vessel as a [hazard to navigation].

(Swergold Decl., Ex. E (Coast Guard Situational Report) (Dkt. No. 105-6) at 2; see also Wolf

Decl., Ex. G (Checklist) (Dkt. No. 96-7) at 9 (stating that the "vessel [was] destroyed due to

navigation hazard"))

Defendants' motion to dismiss the S6 Indictment on spoliation grounds will be

denied.

## VI.    UNDUE DELAY IN PRESENTMENT

Defendants contend that the S6 Indictment must be dismissed because their

presentment under Federal Rule of Criminal Procedure 5 was unduly delayed. (See Aragon Br.

(Dkt. No. 89) at 32) Rule 5 states that "[a] person making an arrest outside the United States

must take the defendant without unnecessary delay before a magistrate judge. . . ." Fed. R. Crim.

P. 5(a)(1)(B).

Here, Defendants were apprehended in the Pacific Ocean, hundreds of miles from

the mainland, and thousands of miles from this District. (Swergold Decl., Ex. E (Coast Guard

Situational Report) (Dkt. No. 105-6) at 2) Transport from the site of the interdiction to New

York took sixteen days. In other MDLEA prosecutions where defendants have been apprehended on the high seas, comparable delays in presentment have not been found unreasonable under Rule 5. See e.g., United States v. Torres-Iturre, 2016 WL 2757283, at *3-4 (S.D. Cal. May 12, 2016) ("21 days to transport Defendants to San Diego was a reasonable period of time" given that "Defendants were arrested 2439 nautical miles from San Diego"); United States v. Savchenko, 201 F.R.D. 503, 506 (S.D. Cal. 2001) ("16 days [was] more than reasonable for the transport of the fishing vessel from the high seas approximately 500 nautical miles from Mexico" to the Southern District of California).

This Court finds that the sixteen-day delay in presentment here was not unreasonable under the circumstances. Defendants' motion to dismiss the S6 Indictment on grounds of undue delay in presentment will be denied.[16]

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the S6 Indictment are denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 70, 88, 165, 182-83).

Dated: New York, New York        SO ORDERED.
        July 5, 2017

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge

---

[16] Moreover, the "overwhelming authority" indicates that "the appropriate remedy for a violation of Rule 5(a) is suppression of any prejudicial statements made during the period of pre-arraignment delay," rather than dismissal of the indictment. United States v. DiGregorio, 795 F. Supp. 630, 634 (S.D.N.Y. 1992) (denying motion to dismiss indictment where "[i]t [wa]s undisputed that the Defendants were not brought before a judicial officer of any kind . . . [for] approximately five months after the[ir] arrests," and where "the Government concede[d] that it [had] violated Rule 5(a)" (collecting cases)); see also Torres-Iturre, 2016 WL 2757283, at *3 ("district courts in maritime drug cases have . . . recognized that a violation of Rule 5 does not justify dismissal of an indictment" (citing Savchenko, 201 F.R.D. at 509)).